**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **CONTINENTAL RESOURCES, INC.**, an Oklahoma corporation, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 4:25-cv-02181 |
| **HESS CORPORATION**, a Delaware corporation, **HESS BAKKEN INVESTMENTS II, LLC**, a Delaware limited liability company, **HESS TRADING CORPORATION**, a Delaware Corporation, and **HESS MIDSTREAM LP**, a Delaware limited partnership, | § § § § § § § § | |
| *Defendants.* | § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Continental Resources, Inc. ("Continental"), for its Complaint against the Defendants Hess Corporation, Hess Bakken Investments II, LLC, Hess Trading Corporation, and Hess Midstream LP (collectively the "Hess Defendants"), states and alleges as follows:

**Introduction**

1.     Continental asserts claims for fraud and deceit, conversion, breach of implied contract, aiding and abetting fraud and deceit, civil conspiracy, money had and received, unjust enrichment, constructive trust, an accounting, and exemplary damages, all of which arise out of unreasonable and improper conduct by the Hess Defendants that has resulted in Continental being deprived of approximately $34–$69 million dollars of revenue which Continental should have received for oil and gas production from wells operated by Hess Bakken Investments II, LLC in the Williston Basin in North Dakota. The Hess Defendants' wrongful conduct with respect to

Continental is continuing and has not only deprived Continental of revenues owed, but has also enriched the Hess Defendants at Continental's expense.

## Parties, Jurisdiction and Venue

2.      Continental is a corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business in Oklahoma City.

3.      On information and belief, Hess Corporation ("Hess Corp") is a Delaware corporation, with its principal place of business located at 1185 Avenue of the Americas, New York, New York 10036. Hess Corp does business in the State of Texas.

4.      On information and belief, Hess Bakken Investments II, LLC ("HBI") is a Delaware limited liability company, with its principal place of business located at 1501 McKinney Street, Houston, Texas 77010. HBI operated 1,757 production wells in North Dakota as of December 31, 2023. Hess Bakken Investments III, LLC is the sole member of HBI, and Hess Bakken Investments IV, LLC is the sole member of Hess Bakken Investments III, LLC. The sole members of Hess Bakken Investments IV, LLC are (1) Hess Bakken Holdings Corporation, (2) Hess Bakken Holdings II Corporation, (3) Hess Sub-Holdings Bakken Corporation, and (4) Hess Upstream North Dakota, Inc. All four of those entities are Delaware corporations with their principal places of business in New York.

5.      On information and belief, Hess Trading Corporation ("HTC") is a Delaware corporation, with its principal place of business located at 1185 Avenue of the Americas, New York, New York 10036. HTC owns and controls the oil and gas produced from the wells operated by HBI in the Williston Basin area of North Dakota. HTC also enters in contracts with midstream companies regarding that oil and gas production and sells the hydrocarbons produced from HBI's wells. HTC does business in the State of Texas.

6. On information and belief, Hess Midstream LP ("HESM") is a Delaware limited partnership with its principal place of business located at 1501 McKinney Street, Houston, Texas 77010. HESM's shares are owned by Hess Corp and the public, and HESM's general partner is Hess Midstream GP LP. Hess Infrastructure Partners GP, LLC and Hess Midstream GP LLC are the sole partners of Hess Midstream GP LP. Hess Infrastructure Partners GP, LLC is the sole member of Hess Midstream GP LLC. The two members of Hess Infrastructure Partners GP, LLC are Hess Corp and Global Infrastructure Partners. Global Infrastructure Partners is a part of BlackRock, Inc.. BlackRock, Inc. is a Delaware corporation with its principal place of business in New York.

7. On information and belief, HESM, through entities such as but not limited to Hess Midstream Operations, LP ("HESM OP") and Hess Infrastructure Partners, LP ("HIP"), owns operating companies that provide, among other things, gathering and processing services in the Williston Basin area of North Dakota. Those operating companies include Hess Bakken Processing LLC ("HBP"), Hess TGP Operations LP ("HTO"), Hess North Dakota Pipelines Operations, LP ("HNDP"), and Hess Tioga Gas Plant, LLC ("HTGP").

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a), as complete diversity of citizenship exists between Continental and each of the Hess Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in the Southern District of Texas, Houston Division, pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to the claims in this lawsuit occurred in this District, including the Hess Defendants' negotiation and execution

of relevant contracts and the Hess Defendants' formulation and implementation of their scheme to enrich themselves to the detriment of Continental.

## Factual Allegations

**A.  *Continental owns significant oil and gas interests in the Williston Basin, including working interests in wells operated by HBI, and thereby depends on HBI to properly fulfill its duties as operator.***

10.    Continental owns a working interest in approximately 7,053 wells in the Williston Basin in North Dakota. As a working interest owner, Continental shares in the costs to drill, complete and produce wells in proportion to its working interest. Correspondingly, Continental is entitled to receive either its share of the oil, gas and natural gas liquids ("NGLs") production from the wells (referred to as "taking in kind") or its share of the proceeds obtained from the sale of the oil, gas and NGLs produced from the wells in proportion to its working interest.

11.     Oil and gas wells often have multiple working interest owners. Those working interest owners typically select a company (often a working interest owner or an affiliate of one) to serve as the operator of the well, charged with managing and administering the operation of the well.

12.    Continental is also an operator of some of the wells in which it owns a working interest in the Williston Basin. It is therefore knowledgeable of the duties and responsibilities of the operator of an oil and gas well.

13.    The duties and responsibilities of an operator include (but are not limited to) treating all interest owners fairly and equitably, charging only reasonable and actual expenses, and maximizing the value of the mineral interests that the operator is tasked with managing and administering. An operator has a duty to consider the working interest owners' interest on par with the operator's interest.

14.     Rather than take its oil and gas in kind, a working interest owner may elect for the operator to market the working interest owner's share of the oil and gas produced. In such cases, in addition to the obligations set forth above, the operator has the obligation to remit, on a monthly basis, to the working interest owners for which it markets the oil and gas production the revenues attributable to those owners' working interest in the wells. All non-operating working interest owners have the right to be paid their proportionate share of the revenue derived from the operator's sale of the oil, gas and NGLs extracted from the leased minerals.

15.     Continental owns a working interest in numerous wells in the Williston Basin in which another entity operates the well. Across the Williston Basin, Continental works with over 62 different operators for the various wells in which Continental owns a working interest.

16.     HBI is one of the operators with which Continental works in the Williston Basin. Specifically, HBI operates approximately 483 producing wells in the Williston Basin in which Continental owns a working interest (the "Subject Wells").

17.     With respect to the Subject Wells operated by HBI, HBI and Continental have implied contracts based on their course of conduct. It is common practice in North Dakota for the working interest owners in a well not to execute a joint operating agreement setting forth their rights and obligations relating to the well and the production therefrom. However, working interest owners and operators generally recognize the rights and obligations between them and often execute other types of written agreements pertaining to the operation of a well. For example, before drilling a well an operator issues an Authorization for Expenditure ("AFE") that offers the non-operating working interest owners the opportunity to participate in the well. The non-operating working interest owner communicates its decision whether to participate in the well by signing

and returning to the operator an election letter. Continental has executed election letters for AFEs issued by HBI pertaining to the Subject Wells for the wells in which Continental participated.

18.     As a non-operating working interest owner in the Subject Wells operated by HBI, Continental depends on HBI to maximize the value of Continental's working interest in the wells, to treat Continental fairly and equitably and on par with the interests of HBI, and to timely remit to Continental the correct amount of revenue attributable to Continental's working interest.

19.     In connection with the above duties of HBI, Continental has relied upon HBI to enter into commercially reasonable arrangements for the sale of the hydrocarbons produced from the Subject Wells. Such sales often occur in the field of production, where a market exists for third-party midstream purchasers to buy unprocessed hydrocarbons from upstream producers and then to seek a business profit by adding value to those hydrocarbons through activities such as gathering, compression, dehydration, fractionation, processing, blending, and transportation to markets further downstream. However, producers also have the option to retain their hydrocarbons and engage in post-production midstream enhancement activities themselves (or through a contractor) in hopes of capturing midstream profit directly. In either instance, an operator who is marketing other working interest owners' hydrocarbons along with its own has duty to seek commercially reasonable arrangements that place the other working interest owners' interests on par with its own.

20.     When sales occur at markets in the producing field, the gross proceeds and prices received by operators and non-operating working interest owners from sales to midstream purchasers typically result from downstream index prices that are then adjusted by the midstream purchaser using negotiated pricing components for post-sale activities performed by the midstream purchaser, including gathering, compression, dehydration, fractionation, processing, blending and

transportation, all of which often occur before the gas is resold by the midstream purchaser at downstream markets ("Revenue Price Adjustments").

21.     Correspondingly, when producers provide the midstream enhancement services themselves and then sell their hydrocarbons at markets further downstream, the fees and costs for any midstream enhancement services they provide are deducted from their own and other working interest owners' downstream revenue ("Midstream Service Fees").

22.     In either case, producers identify the Revenue Price Adjustments and/or Midstream Service Fees on revenue statements provided to working interest and royalty owners.

23.     With respect to the Subject Wells, Hess Corp and its affiliates, including HBI and HTC, engaged in a series of incestuous, non-arm's-length transactions that artificially inflated the Midstream Service Fees and/or Revenue Price Adjustments deducted from and passed through to non-operating working interest owners like Continental, thereby enriching Hess-affiliated interests at the expense of non-Hess working interest owners, including Continental.

**B.** ***The Hess Defendants engage in a scheme via various agreements between Hess Corp affiliates to enrich themselves at the expense of working interest owners including Continental.***

24.     In 2012, Hess embarked on a restructuring plan for its North Dakota assets. The plan involved building out oil and gas infrastructure projects in North Dakota and a series of self-dealing agreements between Hess Corp affiliates. One goal of this plan was to monetize Hess Corp's midstream infrastructure in North Dakota, which would in turn fund Hess Corp's infrastructure build out in the Williston Basin.

25.     Upon information and belief, all or a substantial portion of the Hess Defendants' scheme was developed and implemented in this District, and the self-dealing contracts between Hess Corp affiliates were drafted and executed in this District.

26.     As part of the Hess Defendants' scheme, Hess Corp created HESM, a wholly owned subsidiary. HESM took control over the operations of Hess Corp's gathering and processing entities, including: (1) the Tioga Gas Plant, which processes gas from HBI-operated wells, as well as gas from third-party operators, in the Williston Basin of North Dakota; (2) HBP, which owns an interest in the Tioga Gas Plant; (2) HTO, which owns an interest in the Tioga Gas Plant; (3) HNDP, which owns an interest in the various gathering systems that gather and transport oil and gas in the Williston Basin area of North Dakota.

27.     At Hess Corp's direction, another wholly-owned subsidiary, HBI, entered into an affiliate agreement with HTC, another wholly-owned subsidiary of Hess Corp. Under this agreement, HTC buys gas from HBI at the wellhead, HTC pays HESM's Midstream Service Fees for gathering, processing and fractionation, and HBI is then paid the downstream value of the gas less the Midstream Service Fees that HTC paid to HESM and its subsidiaries. This agreement was not the result of an arm's-length negotiation, but rather handled by Hess Corp employees on behalf of both contracting entities.

28.     HTC entered into long-term contracts with the subsidiaries of its affiliate, HESM, for these subsidiaries to gather, compress, transport, store and process oil, gas and plant products from the Subject Wells. These agreements also were not the result of arm's-length negotiations but were handled by Hess Corp employees on behalf of both contracting entities.

29.     For non-operating working interest owners, including Continental, the agreements between Hess Corp affiliates have resulted in net revenues far below market value due to the imposition of excessive and unreasonable Midstream Services Fees paid to HESM.

30.     By entering into these agreements, Hess Corp has transferred value from its upstream assets (such as HBI) to its midstream assets (namely, HESM). Rather than operate with

the best interests of non-operating working interest owners in mind, HBI instead operates at the behest of HESM. For instance, HESM subsidiaries have the unilateral right to extend the various affiliate agreements. The operator of the Subject Wells, HBI, has no such right to decide whether the agreements should be extended or are in its best interest or in the best interests of the working interest owners relying on HBI as operator.

31.    The affiliate agreements minimize risk to HESM through various mechanisms. For example, the agreements include minimum volume commitments. They also allow for annual fee recalculations whereby HESM can increase fees if volumes fall below projected amounts, but allow HESM to leave fees unchanged if volumes exceed projections. HESM has in fact increased fees when volumes fell below estimates but has not lowered fees when volumes exceed estimates.

32.    The structure of the agreements ensures that fees paid to HESM will never decrease, but rather can only increase. Effectively, this guarantees HESM a return on capital for any amounts spent building out its oil and gas operations in the Williston Basin.

33.    The affiliate agreements do not contain any sort of provision allowing for the renegotiation of HESM's fees if such fees become excessive relative to the market.

34.    The structure of these affiliate agreements allows the unchecked increase of the fees paid to HESM and a corresponding decrease in net revenue to unreasonable, out-of-market levels and imposes such burden on non-operating working interest owners like Continental. For example, at one point the fees to HESM escalated such that HTC could not cover HESM's fees as required by HTC's agreement with HBI. Rather than bring HESM's fees in line with market rates, HBI agreed to pay higher fees to HTC—thereby imposing higher fees and more severe deductions on Continental and other non-operating working interest owners, with resulting revenue far below market values in the field.

35. The Midstream Service Fees HBI paid are several times higher than the Revenue Price Adjustments experienced by Continental for wells it operates in the Williston Basin, or even the average fees and/or Revenue Price Adjustments deducted by other operators in the Williston Basin.

36. As set forth above, the non-arm's-length affiliate agreements favor HESM, thereby increasing its value and inflating the price at which Hess Corp was able to sell a 50% stake in HESM to GIP. However, because Hess Corp retains a 38% interest in HESM, it effectively does not bear the same financial burden borne by Continental and other non-operating working interest owners in the Subject Wells for the excessive HESM fees, because Hess Corp captures the benefit of HESM's excessive fees via its stake in HESM.

37. The Hess affiliate agreements also allow for the charging of excessive Midstream Service Fees by understating the "residual value" of the Tioga Plant. The residual value is the remaining value of the Tioga Plant at the end of the first 10-year period under the affiliate agreements. The residual value factors into the fees charged by HESM; a lower residual value requires higher fees. Hess Corp and HESM understated the residual value of the Tioga Plant to justify increased Midstream Service Fees charged by HESM through HTC to HBI and the other working interest owners.

38. The affiliate agreements all served to increase the value of HESM, thereby unjustly enriching HESM and Hess Corp at the expense of Continental and other non-operating working interest owners who have been forced to carry the burden of HESM's unreasonable, out-of-market fees and lower net revenue.

39. The affiliate agreements also enabled Hess Corp and HESM to pursue midstream infrastructure projects without concern for whether the costs of such projects were reasonable or

whether the capacity to be constructed was necessary. HESM's construction projects were all over budget, and HESM built midstream capacity in excess of its actual needs based on its own projections of expected gas production. The affiliate agreements enabled HESM to pass on its capital expenditures to Continental and other non-operating working interest owners in the Subject Wells.

40.     Hess Corp continues to exercise operational control over HESM, and substantial overlap exists between Hess Corp and the entities that are parties to the affiliate agreements. Hess Corp and HESM share the same Chief Executive Officer. HBI and HESM share the same President. Personnel of Hess Corp, HBI, HTC, HESM and the HESM subsidiaries all work on the same floor at the same office in Houston, Texas. All HBI, HTC, HESM and HESM subsidiaries' personnel are employees of Hess Corp.

41.     The Hess Defendants have served as agents and alter egos for each other and share a common unity of interests. All of the Hess Defendants are organized and operated in a manner intended to benefit Hess Corp. All personnel performing services for the Hess Defendants are Hess Corp employees, paid by Hess Corp.

42.     The scheme enacted by the Hess Defendants has resulted in Continental being charged with excessive, unreasonable fees on gas as compared to the average costs and/or pricing adjustments charged by Continental and other operators in the Williston Basin. Correspondingly, this has resulted in Continental being paid substantially less net revenue from the Subject Wells compared to market values in the same gas fields. The Hess Defendants' scheme has also resulted in HBI deducting higher fees from Continental's oil revenue than the fees charged or adjustments experienced by other operators.

43.     Post-production deductions of Midstream Service Fees must be based on actual costs and must also be reasonable within the marketplace based on arm's-length transactions. Correspondingly, Revenue Price Adjustments must reflect commercially reasonable terms negotiated by parties in arm's-length transactions to arrive at fair market values for proceeds in field-based markets. The Hess Defendants have not charged Continental reasonable fees and have therefore deprived Continental of a fair market return for its working interest in the Subject Wells.

**C.  *HBI fails to pay Continental the net revenue to which Continental is entitled for its working interest in the Subject Wells and refuses and otherwise fails to justify the net revenue being paid out from the Subject Wells.***

44.     Following an internal audit of the net revenues it was receiving from the Subject Wells, Continental began to suspect that HBI was selling gas from wells in which Continental owned a working interest to Hess's midstream affiliate, HESM, for an artificially low, non-market value. This contractual arrangement between affiliated companies allowed HESM to profit at the expense of working interest owners, including but not limited to Continental.

45.     As an example of the improper and unreasonable net revenue Continental was receiving from the Subject Wells, Continental compared the realized prices for gas sold from wells operated by Continental in the Williston Basin to the realized prices for gas sold from HBI-operated Subject Wells. The realized gas prices for HBI-operated wells were dramatically lower than the gas prices realized on Continental ("CLR")-operated wells.



46.     Continental found a similar difference for realized prices from oil sold from Continental-operated and HBI-operated wells:



47.     HTC's excessive Midstream Service Fees paid to HESM resulted in negative prices realized by Continental for gas sold from the subject wells. In other words, HTC's excessive

Midstream Service Fees paid to HESM have exceeded the sales price of the gas, with the result that Continental has been forced to pay HTC marketing costs *without receiving any proceeds whatsoever as the result of HTC's marketing efforts*.

48.     As another example indicative of the unreasonable net revenue from the Subject Wells, Continental compared the realized gas prices from wells operated by HBI and wells operated by third-party peers of HBI and Continental in the Williston Basin. The realized gas prices from the Subject Wells were markedly lower than the realized prices from peer operators.

49.     In July 2020, Continental sent a letter to Hess Corp, requesting that Hess Corp cooperate with Continental in permitting Continental to audit HBI's revenue payments to Continental relating to Continental's non-operating working interests in the Subject Wells.

50.     In that July 2020 letter, Continental also communicated its concern that HBI's non-arm's-length contracts with its affiliates accounted for the discrepancy in the net revenues realized by Continental from the Subject Wells as compared to the net revenues from wells in the Williston Basin operated by Continental and other operators.

51.     Hess Corp initially refused to respond to Continental's request for an audit. After multiple follow-up communications from Continental, Hess Corp refused to permit the requested audit.

52.     Continental contacted Hess Corp again on April 21, 2021, stating that Hess's response was not acceptable and again requesting an audit. Continental proposed a narrow and limited audit subject to a confidentiality agreement in an effort to work cooperatively with Hess.

53.     On May 5, 2021, HBI responded to Continental, stating it would not allow the requested audit but would address specific questions regarding the net revenues from the Subject Wells.

54.     In October 2021, Continental responded to HBI's May 5, 2021 letter by sending a list of questions seeking information and explanations regarding the net revenues distributed by HBI to Continental, and reiterating that the realized prices Continental was receiving from the HBI-operated Subject Wells were significantly lower than the prices Continental was realizing from wells its operated and from wells operated by Continental's and HBI's peers in the Williston Basin.

55.     In response to Continental's inquiries and up to the present, HBI and Hess Corp failed to provide any legitimate explanation for the discrepancy in the net revenues received by Continental from the Subject Wells versus the net revenues received from wells operated by other operators in the same fields as the Subject Wells.

56.     Since Continental's written correspondence with Hess and HBI regarding the significant disparity between the realized prices from the Subject Wells versus wells operated by Continental or third parties in the same fields, that disparity has continued through the present and has in fact increased.

57.     HBI should pay the non-operating working interest owners in the Subject Wells, including Continental, at least the average of the net revenue paid by all other operators in the fields in which HBI operates the Subject Wells.

58.     HBI instead has paid Continental net revenues well below the average revenue that Continental receives from other operators in the same fields as the Subject Wells.

59.     HBI has routinely reported substantial negative net gas revenue from the Subject Wells.

60.     By contrast, Continental, along with other operators in the Williston Basin, routinely reports positive gas revenue and pays such revenue to non-operating working interest owners from wells operated in the same fields as the Subject Wells.

61.     In 2019 HBI began reporting its Midstream Service Fees as a category titled "Admin Costs." Previously, such fees had been captured in a single line labeled "Other Deductions." A working interest owner would not be able to reasonably determine the basis for the costs being passed on as "Admin Costs."

62.     HBI's fees charged to Continental and other working interest owners are unreasonable and the result of a scheme between the Hess Defendants to enrich themselves, and above all Hess Corp, at the expense of non-operating working interest owners like Continental, as set forth below.

## Claims

### Count 1. Fraud and Deceit by Misrepresentation (HBI)

63.     Continental realleges and incorporates by reference Paragraphs 1 through 62 of this Complaint.

64.     HBI made false material representations that it did not believe to be true, and also made assertions of material fact that were not true and with respect to which it had no reasonable grounds to believe were true, relating to the HESM/HTC fees it passed on to Continental through deductions. HBI sent revenue statements to Continental falsely representing that HBI charged reasonable and actual costs to Continental, when HBI actually allocated to Continental excessive, improper, illegitimate, unauthorized and unreasonable fees for the sale of Continental's share of oil, gas and NGLs from each of the Subject Wells operated by HBI. HBI knew that the HESM/HTC fees it was deducting and passing to Continental were excessive, improper, illegitimate,

unauthorized and unreasonable. HBI also falsely represented "Admin Costs" in its revenue statements when it was in fact disguising its excessive, improper, illegitimate, unauthorized and unreasonable fees.

65.    HBI intended to induce Continental to act in reliance on HBI's false and deceptive representations, and Continental did so act by, among other things, making decisions relating to whether or not to participate in the Subject Wells.

66.    HBI thereby deceived and defrauded Continental in violation of NDCC § 9-10-02 and/or other applicable law.

67.    Continental has suffered substantial damages as a result of the fraud and deceit.

68.    Continental requests that judgment be entered in its favor and against HBI, and that Continental be awarded its actual damages and costs, including attorneys' fees and costs, in an amount to be proven at trial. Furthermore, because the conduct of HBI as alleged herein was intentional, oppressive, fraudulent, malicious and in gross disregard of the rights of Continental, and was done with the express purpose of deceiving Continental and depriving Continental of amounts owed to it by HBI in furtherance of the Hess Defendants' scheme, as set forth herein, Continental seeks exemplary damages from HBI.

**Count 2. Fraud and Deceit by Concealment (HBI)**

69.    Continental realleges and incorporates by reference Paragraphs 1 through 68 of this Complaint.

70.    HBI made statements that are and were likely to mislead because of the concealment and suppression of material facts and failure to disclose pertinent information related to fees it charged to Continental as described above. For example, HBI failed to inform Continental that it was overcharging Continental via Hess affiliate agreements and was allocating to

Continental excessive, improper, illegitimate, unauthorized and unreasonable fees attributable to midstream enhancement activities prior to the downstream sale of Continental's share of oil, gas and NGLs from each of the Subject Wells operated by HBI. HBI knew that the fees charged to Continental, as reflected in the HBI revenue statements, were excessive, improper, illegitimate, unauthorized and unreasonable. HBI also concealed the true nature of the fees by labeling them "Admin Costs" in its revenue statements.

71.     HBI thereby concealed and suppressed information from Continental in violation of NDCC § 9-10-02 and/or other applicable law.

72.     Continental has suffered substantial damages as a result of this fraud and deceit.

73.     Continental requests that judgment be entered in its favor and against HBI, and that Continental be awarded its actual damages and costs, including attorneys' fees and costs, in an amount to be proven at trial. Furthermore, because the conduct of HBI as alleged herein was intentional, oppressive, fraudulent, malicious and in gross disregard of the rights of Continental, and was done with the express purpose of deceiving Continental and depriving Continental of amounts owed to it by HBI in furtherance of the Hess Defendants' scheme, as set forth herein, Continental seeks exemplary damages from HBI.

**Count 3. Conversion (HBI)**

74.     Continental realleges and incorporates by reference Paragraphs 1 through 73 of this Complaint.

75.     HBI has charged or deducted excessive, improper, illegitimate, unauthorized and unreasonable fees in excess of Continental's percentage interest in the producing Subject Wells. HBI knew that the fees paid by HTC to HESM, and passed through to Continental, as reflected in the HBI revenue statements, were excessive, improper, illegitimate, unauthorized and

unreasonable. HBI has therefore tortiously detained and wrongfully exercised dominion or control over monies of Continental inconsistent with and in defiance of the rights of Continental. HBI has intentionally and wrongfully deprived Continental of such money and has refused to return such money or otherwise address the issue despite Continental's demand.

76.    HBI has thereby converted monies belonging to Continental.

77.    Continental has suffered substantial damages as a result of the conversion.

78.    Continental requests that judgment be entered in its favor and against HBI, and that Continental be awarded its actual damages and costs, including attorneys' fees and costs, in an amount to be proven at trial. Furthermore, because the conduct of HBI as alleged herein was intentional, oppressive, fraudulent, malicious and in gross disregard of the rights of Continental, and was done with the express purpose of deceiving Continental and depriving Continental of amounts owed to it by HBI in furtherance of the Hess Defendants' scheme, as set forth herein, Continental seeks exemplary damages from HBI.

**Count 4. Breach of Implied Contract (HBI)**

79.    Continental realleges and incorporates by reference Paragraphs 1 through 78 of this Complaint.

80.    Through their conduct, Continental and HBI have entered into implied contracts.

81.    The implied contracts established by the conduct of HBI and Continental call for HBI to drill and operate the Subject Wells, and either to negotiate commercially reasonable Revenue Price Adjustments to arrive at gross proceeds for the sale of oil, gas, and NGLs in the field of production, or to incur actual and reasonable fees for any midstream services it provides to prepare the oil, gas and NGLs for sale at secondary markets further downstream of the producing

field, such that revenues realized by Continental and other working interest owners would reflect reasonable market values.

82.     Continental has fully performed its obligations under the implied contracts and has fully funded its obligations.

83.     HBI passed through unreasonable fees and/or Revenue Price Adjustments that reduced and/or eliminated revenues realized by Continental.

84.     HBI is the agent for Continental in connection with midstream enhancement services under the implied contracts and owed duties to Continental in connection with those services.

85.     HBI has been instead making excessive, improper, illegitimate, unauthorized and unreasonable adjustments or deductions from the proceeds owed to Continental. In so doing, HBI has breached the implied contracts.

86.     Continental has suffered substantial damages as a result of the breach.

87.     Continental requests that judgment be entered in its favor and against HBI, and that Continental be awarded its actual damages and costs in an amount to be proven at trial.

**Count 5. Aiding and Abetting Fraud and Deceit (Hess Defendants other than HBI)**

88.     Continental realleges and incorporates by reference Paragraphs 1 through 87 of this Complaint.

89.     Each of the other Hess Defendants knew that HBI was passing through to Continental the excessive, improper, illegitimate, unauthorized and unreasonable fees charged by HESM to HTC, but each other Hess Defendant concealed the scheme from Continental. The Hess affiliate agreements were the means by which the Hess Defendants accomplished this illicit scheme, and all the Hess Defendants knew that the fees passed to Continental by HBI would result

in lower net revenue to Continental, and that such deductions, as reflected in the HBI revenue statements, were excessive, improper, illegitimate, unauthorized and unreasonable.

90.    None of the Hess Defendants informed Continental of the scheme to deceive Continental.

91.    The Hess Defendants each provided substantial assistance to HBI in achieving the fraud and deceit and intended to aid and abet HBI in achieving the fraud and deceit.

92.    Continental suffered substantial damages as a result of the misconduct.

93.    Continental requests that judgment be entered in its favor and against the Hess Defendants other than HBI, and that Continental be awarded its actual damages and costs, including attorneys' fees and costs, in an amount to be proven at trial. Furthermore, because the conduct of the Hess Defendants as alleged herein was intentional, oppressive, fraudulent, malicious and in gross disregard of the rights of Continental, and was done with the express purpose of deceiving Continental and depriving Continental of amounts owed to it by HBI in furtherance of the Hess Defendants' scheme, as set forth herein, Continental seeks exemplary damages from the Hess Defendants other than HBI.

**Count 6. Civil Conspiracy (All Hess Defendants)**

94.    Continental realleges and incorporates by reference Paragraphs 1 through 93 of this Complaint.

95.    The Hess Defendants intended and agreed that HBI would pass through to Continental excessive, improper, illegitimate, unauthorized and unreasonable fees charged by HESM and HTC, and the Hess affiliate agreements were used to accomplish that objective. All the Hess Defendants knew that the fees deducted from Continental's share of revenue by HBI, as

reflected in the HBI revenue statements, were excessive, improper, illegitimate, unauthorized and unreasonable.

96.     HBI then engaged in unlawful and overt acts by deducting and passing through to Continental unreasonable fees and by concealing the scheme from Continental.

97.     Continental has suffered substantial damages as a result of the conspiracy.

98.     Continental requests that judgment be entered in its favor and against the Hess Defendants, and that Continental be awarded its actual damages and costs, including attorneys' fees and costs, in an amount to be proven at trial. Furthermore, because the conduct of the Hess Defendants as alleged herein was intentional, oppressive, fraudulent, malicious and in gross disregard of the rights of Continental, and was done with the express purpose of deceiving Continental and depriving Continental of amounts owed to it by HBI in furtherance of the Hess Defendants' scheme, as set forth herein, Continental seeks exemplary damages from the Hess Defendants.

**Count 7. Money Had and Received (all Hess Defendants)**

99.     Continental realleges and incorporates by reference Paragraphs 1 through 98 of this Complaint.

100.    The Hess Defendants have in their possession money that in equity and good conscience belongs to and should be returned to Continental.

101.    The Hess Defendants should be ordered to disgorge their ill-gotten gains.

102.    Continental requests that judgment be entered in its favor and against the Hess Defendants and that Continental be awarded its actual damages and costs in an amount to be proven at trial.

**Count 8. Unjust Enrichment (All Hess Defendants)**

103.    Continental realleges and incorporates by reference Paragraphs 1 through 102 of this Complaint.

104.    The Hess Defendants have unjustly enriched themselves at the expense and impoverishment of Continental as a direct and proximate result of the misconduct alleged herein.

105.    The Hess Defendants have no justification for the excessive, improper, illegitimate, unauthorized and unreasonable fees deducted and passed through to Continental, and it would be unconscionable for the Hess Defendants to retain such wrongfully secured benefits.

106.    Hess Corp and HESM were also unjustly enriched through execution of the affiliate scheme by which Hess Corp obtained proceeds from its sale of a 50% interest in HESM that it would not have otherwise received but for the affiliate scheme and used that money to fund its growth plans. HESM was also unjustly enriched through receipt, retention and use of the unreasonable, improper and excessive fees deducted and passed through to Continental that HESM used to fund the build out of its midstream system. Hess Corp and HESM should not be permitted to keep the amounts by which they were unjustly enriched.

107.    Continental has no adequate remedy at law for the misconduct described above and has suffered substantial damages a result of that misconduct.

108.    Continental requests that judgment be entered in its favor and against the Hess Defendants and that the Hess Defendants be required to disgorge the amounts by which they were unjustly enriched. Continental also requests it be awarded its attorneys' fees and costs.

### Count 9. Constructive Trust (All Hess Defendants)

109.    Continental realleges and incorporates by reference Paragraphs 1 through 108 of this Complaint.

110.    The Hess Defendants improperly acquired money from Continental by and through fraud and deceit.

111.    A constructive trust should be imposed as a result of the misconduct of the Hess Defendants to prevent the Hess Defendants from being unjustly enriched.

112.    Continental has no adequate remedy at law and has suffered substantial damages as a result of the misconduct alleged above.

113.    Continental requests that judgment be entered in its favor and against the Hess Defendants, that Continental be awarded its actual damages and costs in an amount to be proven at trial and that the Court impose a constructive trust on the Hess Defendants in that amount.

## Count 10. Accounting (All Hess Defendants)

114.    Continental realleges and incorporates by reference Paragraphs 1 through 113 of the Complaint.

115.    The accounting records relating to the bases for the fees charged by the Hess Defendants and deducted from revenues to which Continental was entitled are in the possession of the Hess Defendants and believed to be complicated and extensive. Despite multiple requests from Continental for review of those records, the Hess Defendants have refused to allow Continental to review them. Continental has therefore been deprived of the means to determine whether and to what extent it has been paid all the revenue to which it is entitled based on the percentage of its working interest in the Subject Wells.

116.    Based on the relationship between Continental and the Hess Defendants, the Hess Defendants have a duty to provide a full and complete accounting of whether Continental has been paid all revenues to which it was entitled based on Continental's working interest percentage in the Subject Wells.

117.    Continental requests that the Hess Defendants be ordered to provide a full and complete accounting of the fees and adjustments they made to revenues from sales of hydrocarbons from the subject wells, including those attributable to Continental's working interest and whether Continental has been paid all revenues to which it was entitled based on Continental's working interest percentage in the Subject Wells.

## Jury Demand

Continental demands a jury trial on all counts triable by jury.

## Request for Relief

WHEREFORE, Continental requests that judgment be entered in its favor and that it be awarded the following relief consistent with the allegations set forth above:

1.    Compensatory damages or restitution in an amount to be proven at trial, plus interest;

2.    Exemplary damages;

3.    An Order requiring an accounting for, and imposition of a constructive trust upon, all monies received by the Hess Defendants as a result of the unlawful and unjust conduct alleged herein;

4.    An Order enjoining the Hess Defendants from continuing their unlawful scheme to force Continental to bear inflated oil and gas gathering and processing costs through reduced royalty payments; and

5.    Costs, disbursements, attorneys' fees, and such further relief as it deemed just and equitable.

Respectfully submitted,

**THE NORRIS FIRM PC**

*/s/ Joshua A. Norris*
Joshua A. Norris
Attorney-in-Charge
Texas State Bar No. 24027577
Thomas McCall
Texas Bar No. 24120236
Justin P. Quin
Texas Bar No. 24103893
24 Greenway Plaza, Suite 1800
Houston, Texas 77046
Telephone: (713) 588-4536
Email: josh@tnflaw.com
Email: thomas@tnflaw.com
Email: justin@tnflaw.com

-AND-

William D. Lampton
Texas State Bar No. 24138271
1575 Church Street, Suite C
Zachary, LA 70791
Telephone: (225) 612-2003
Email: will@tnflaw.com

***ATTORNEYS FOR CONTINENTAL
RESOURCES, INC.***